## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>vs. )<br>)<br>ISAIAH SHERRELL, )<br>)<br>Defendant. ) | Criminal No.  04-144 |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Introduction

Pending before the court are: (1) a petition filed by the probation office on December 27, 2019 (ECF No. 589) to revoke the term of supervised release being served by Isaiah Sherrell ("Sherrell"); and (2) a supplemental petition filed on October 19, 2020 (ECF No. 637).  On September 23, 2020, the court conducted an evidentiary hearing by videoconference, with the consent of both parties.  After the hearing, the parties filed a joint status report (ECF No. 643), stating that: (1) Sherrell admitted to the Grade C violation alleged in the supplemental petition; and (2) the parties disagreed about the allegation set forth in the original petition and would submit proposed findings of fact and conclusions of law.  Those post-hearing filings (ECF Nos. 648, 649, 650) are now complete and the petition is ripe for disposition.

Procedural History

Sherrell pleaded guilty in Crim. No. 04-144 to conspiracy to distribute 50 grams or more of crack cocaine and was sentenced on October 3, 2005, to 120 months of imprisonment, to be followed by 5 years of supervised release.  Sherrell completed his initial prison term on December 5, 2014.

On June 18, 2015, the court modified the conditions of supervision and directed Sherrell to complete the intermediate sanctions program (ECF No. 558). In January and April 2016, and March 2017 (ECF Nos. 560, 562, 566), the probation office reported other violations, but did not seek sanctions. On November 20, 2017, the court modified the conditions of supervision to add a search condition and prohibit Sherrell from using or possessing alcohol (ECF No. 569).

On February 13, 2018, the court modified the conditions of supervision again. Sherrell was required to complete a 24-session Battering Intervention Program at Renewal Inc. and was prohibited from direct or indirect contact with his former girlfriend[1] during the pendency of charges arising out of a domestic incident on January 31, 2018 (ECF No. 569).

On April 13, 2018, Sherrell admitted a grade B violation of supervision (possession of cocaine). The court revoked Sherrell's supervised release and sentenced him to a period of incarceration of 18 months, followed by a new period of supervised release of 3 years, with additional conditions.

Sherrell was released from prison on July 3, 2019 and began serving his term of supervised release. On December 27, 2019, the probation office filed the pending petition to inform the court that Sherrell was involved in an incident on December 26-27, 2019, in which he violated a condition of his supervised release. The court issued a warrant and directed that no bond be set. On January 29, 2020, the court held a hearing on Sherrell's motion for release on bond pending a final revocation hearing, at which Sherrell testified about the incident (Transcript, ECF No. 609). The court granted Sherrell's motion and ordered that Sherrell reside at the Renewal Center. On March 19, 2020, the court ordered his release from Renewal and placed him on home detention with electronic monitoring. The final revocation hearing was

---

[1] This individual is not the alleged victim in the pending proceeding.

2

continued until the related state criminal proceedings were resolved. The parties reported that the state charges were withdrawn on July 30, 2020. As noted, the court conducted an evidentiary hearing on the alleged violation on September 23, 2020 (Transcript, ECF No. 651).

FINDINGS OF FACT

    A.    The Violation Alleged

1. The probation office alleges that Sherrell violated the condition of his supervised release that he not commit another federal, state, or local crime.

2. The alleged violation is based upon an incident on December 26-27, 2019, in which a female (the "victim")[2] reported to Pittsburgh police that Sherrell assaulted her. Sherrell was charged in state court with strangulation (F-2), indecent assault (M-1), simple assault (M-2) and false imprisonment (M-2).

3. Sherrell denies the violation.

4. On July 30, 2020, all state criminal charges stemming from the incident were withdrawn.

5. On January 29, 2020, Sherrell testified under oath in open court about the December 26-27, 2019 incident in support of his motion for release. (Transcript, ECF No. 609).

6. During the hearing on September 23, 2020, Pittsburgh police officer Alyssa Robl ("Robl") and Sergeant Mark Joyce ("Joyce") testified. Government exhibits 1-10 (photographs and a witness statement) were admitted into evidence.

7. With Sherrell's consent, the government filed a compilation of text messages between Sherrell and the victim (ECF No. 647, filed under seal).

---

[2] In their proposed findings, both parties refer to the female involved in the incident as the "victim."

  B.  The Events of December 26-27, 2019

8.  There are several accounts of the events at issue: (a) Sherrell's testimony on January 29, 2020; (b) Robl's and Joyce's testimony about their encounter with the victim; and (c) a written Victim/Witness statement prepared by the victim at 2:02 a.m. on December 27, 2019.  The court finds that Sherrell's testimony about the events of that evening cannot be reconciled with the other testimony and is not credible.

9.  At the time of the incident, the victim was a former intimate sexual partner of Sherrell, but still friendly with him.

10.  On the evening of December 26, 2019, they encountered each other at Art's Tavern.  The victim had some drinks, but it is unclear whether Sherrell was also consuming alcohol.

11.  Sherrell and the victim left the bar together around 10:00 p.m.  Tr. 49.  She believed that Sherrell was going to drive her to her home in the Zone 3 section of Pittsburgh, Pennsylvania.

12.  Instead, Sherrell drove the victim to his house on Thelma Street, in the North Side area of Pittsburgh, Pennsylvania.

13.  At this point, the stories diverge.  The following paragraphs represent the findings of fact made by the court.

14.  The victim got out of Sherrell's car, refused to go into his house, and began walking toward the Kuhn's grocery store.

15.  Sherrell went after her, begged her to get back in the car, and said that he would take her home.  The victim got back into the car.

16. Instead of driving her home, Sherrell drove her to an industrial park area. Based on the victim's description of the buildings and road signs, officers believed that it was Minnotte Square, in the West End neighborhood of Pittsburgh, Pennsylvania. Tr. 30.

17. The victim got out of the car and attempted to flee.

18. Sherrell chased her, choked her, slammed her on the ground numerous times, pulled her pants down and attempted intercourse.

19. The victim reported there was no penetration, but she felt his penis on her inner thigh. Tr. 31.

20. The victim kicked and screamed for help.

21. Because Sherrell choked her, her voice was hoarse and it was hard to scream.

22. Every time she tried to run away, Sherrell chased her.

23. The victim cried, and asked Sherrell how he could do this when he said he loved her and her son.

24. Sherrell finally agreed to take her home.

25. The victim got back into the car.

26. Instead of driving her home, Sherrell drove back to the North Side area.

27. On Marshall Avenue, the victim got out of the car again and ran. She was still naked from the waist down.

28. Sherrell caught her and forced her back into the car.

29. The victim threw her cell phone and Sherrell's cell phone out the car window, in hopes he would stop to search for them. He stopped and the victim was able to exit the car.

30. The victim found her cell phone in the front yard of a house, ran to a side street, hid from Sherrell, and called or texted a female friend to pick her up.

31. The friend immediately drove the victim to the Zone 3 police station (approximately a 10-minute drive, Tr. 42), arriving at approximately 12:45 a.m., in the early morning hours of December 27, 2019.

32. The friend described the victim as distraught and wanted to be sure the incident was reported. Tr. 43.

33. Robl has been a police officer for more than ten years and was on duty at the night desk that evening.

34. Robl's testimony was credible.

35. Robl observed that both women were visibly shaken.

36. The women stated that there was an assault and they wanted to report it. They remained in the station for 45-60 minutes.

37. Robl observed that the victim was disheveled, had no shoes on (in late December), one sock, her jeans were ripped and there were marks around her neck.

38. The victim admitted that she had been drinking earlier in the evening. Robl assessed her as coherent, cooperative and not highly intoxicated. There was no smell of alcohol on her, and no signs of intoxication. There was no indication that the victim urinated on herself.

39. The victim was able to describe the location in which the attack occurred and indicate the location on a map. Tr. 53.

40. The victim was limping, but that was due to an injury to her leg and knee. The victim's other injuries were consistent with being dragged multiple times and choked.

There was visible redness around her neck with little scrape marks. There were scrapes and redness on her back, buttocks and knee. Her knee was starting to bruise and was swollen. Her bottom lip had several cuts that were bleeding. There was blood on her pants near the knee.

41. Robl took photographs to memorialize the victim's injuries (Gov. Ex 1-9). The victim stated that she sustained these injuries during the encounter with Sherrell.

42. The victim denied losing consciousness from the choking, but stated her throat was sore from being gripped around the neck and from screaming. Tr. 40.

43. The victim declined medical treatment and declined to speak to a domestic violence counselor that evening. Tr. 55-56.

44. Robl contacted the on-call district attorney, who advised that charges be filed and that the victim fill out a victim statement.

45. Because the victim already left the Zone 3 station, a fellow officer took the form to the victim's home. After the victim prepared and signed the statement (Gov. Ex. 10), the officer returned it to the station. The statement has a time of 2:02 a.m.

46. The handwriting on the statement is legible and the recitation of events is coherent, logical and generally consistent with the version of events the victim recounted orally to the officers. There is no indication that the statement was prepared by a person who was severely intoxicated.

47. The victim never testified in any legal proceeding.

48. Joyce has served the Pittsburgh police for over 20 years. Joyce provided credible testimony.

49. On the evening of December 26-27, 2019, Joyce was the night shift supervisor at Zone 3. Although Robl had primary contact, Joyce observed the victim for at least 15 minutes. Tr. 62.

50. Joyce testified that the victim was distraught, fearful and emotional. She appeared to have been assaulted, with disheveled clothes, torn pants, scrapes on her knees, dirty, messy hair, dry blood on her mouth, no shoes and only one sock. Tr. 62.

51. Joyce testified that the victim did not appear to be impaired or intoxicated. She was intelligently articulate about the facts of the story. Her recitation was understandable and made sense, including the timeline. She was able to describe locations. There was no indication that the victim urinated on herself.

52. Joyce found the victim's story to be credible, particularly in light of her physical condition.

    C.    Sherrell's version of the events

53. Sherrell testified during the January 29, 2020 hearing. (Transcript, ECF No. 609).

54. Sherrell contends that the incident was provoked by the victim's jealous rage when a former girlfriend came into the tavern. Tr. 23. Sherrell also posits that the friend who took the victim to the police station does not like him. Tr. 26.

55. Sherrell testified that the victim was extremely drunk on the evening of December 26-27, 2019, that she used the men's room twice, and urinated on her pants. Sherrell testified that the victim did not want her kids to see her in that condition, and that she asked him for a ride home because her friend left with someone else.

56. According to Sherrell, he offered to take the victim to get a change of clothes before she went home; the victim passed out in the car and woke up on the North Side;

Sherrell got out of the car to get a change of clothes from his house, turned around and saw the victim walking up the street. Tr. 24.

57. Sherrell admits that he ran up behind her, but explained that he was concerned about her walking alone and drunk late at night. According to Sherrell, the victim stated that she was going to her mother's house, which was around the corner, and her mother would take her home, but she also started crying and said "I just want to go home." Tr. 24.

58. Sherrell testified that he stated he would take her home, did not choke her, but grabbed her and walked her back to the car. Sherrell explained that he did not grab the victim forcefully, but rather, put his arms around her to console her. Tr. 35.

59. Sherrell testified that as he was driving her home, the phone rang, he refused to answer, the victim believed it was another woman and snatched the phone, and he grabbed it back. Tr. 25.

60. Sherrell testified that the alcohol set in and the victim flipped out and went crazy, hitting, punching and scratching him while he was driving. Tr. 26.

61. Sherrell testified that the victim was "out of her mind drunk." Tr. 37.

62. Sherrell testified that while he was on Route 51, he pulled over because the victim had to pee. (It is unclear whether Sherrell disputes this location was the Minnotte Square industrial park area.) Sherrell stated that after she got out of the car, it was just mayhem. Tr. 26.

63. Sherrell denied any forceful contact with the victim at this time, but testified that she passed out and he had to get her up off the ground. He also admitted hugging and comforting her. Tr. 38-39.

64. Sherrell denied choking the victim and explained that anything he did was to try to get her off him, because she was attacking him. Tr. 40.

65. Sherrell admitted he forcefully grabbed her to get her off him. Tr. 43.

66. Sherrell denied hitting the victim in the mouth or ever putting his hands on her face. Tr. 42.

67. Sherrell sought medical treatment at UPMC-Mercy the next day. While he was there, the police arrested him. He was not permitted to file counter-charges against the victim.

68. The subsequent exchanges of text messages between Sherrell and the victim are not persuasive evidence about the actual events of the encounter.

69. Sherrell's testimony is not credible for several reasons. First, there is no corroborating evidence that the victim was severely intoxicated during the incident. She arrived at the Zone 3 station shortly thereafter and was entirely coherent and functional. Second, there is no corroborating evidence that the victim urinated on her pants, particularly to the extent that it would embarrass her in front of her children. The underlying rationale for Sherrell driving the victim to the North Side, rather than to her home in Zone 3 (to get a change of clothes), is therefore not believable. Third, the victim's injuries are not consistent with Sherrell's version that she attacked him while he was driving and he merely warded off that attack. The injuries cannot be explained by her passing out and Sherrell attempting to get her up from the ground. Instead, the victim's injuries are consistent with the victim's version of the events, with Sherrell dragging her multiple times and choking her. The victim's emotional state was not consistent with a jealous, vengeful story; instead, she appeared to be the victim of a

recent physical assault. The victim's attire and appearance (no shoes, one sock, torn, bloody jeans, dirty) was consistent with a recent physical assault.

D. Findings on elements of the charged crimes

70. At all times, Sherrell's conduct was knowing and intentional. He was well aware that his conduct was not welcome.

71. Sherrell caused bodily injury to the victim.

72. Sherrell restrained the victim's liberty against her will when he drove her to the Minnotte Square industrial park, instead of taking her to her home. Sherrell also held the victim against her will when he dragged her back to the car after the assault and drove her back to the North Side.

73. Although the victim was grabbed around the neck and choked, the evidence does not establish that her breathing or circulation were impeded. The victim did not black out and she was able to scream throughout the encounter. There is no evidence that Sherrell threatened her or otherwise attempted to quiet her or blocked her nose or mouth.

74. Sherrell attempted to engage in sexual intercourse with the victim by forcible compulsion, against her will and without her consent.

CONCLUSIONS OF LAW

1. To revoke a term of supervised release, the court must find that the defendant violated a condition of his supervised release by a preponderance of the evidence. 18 U.S.C. § 3583(e)(3).

2.  When the alleged violation relates to the condition that the defendant not commit another federal, state or local crime, there is no requirement that the defendant be convicted, or even indicted. *United States v. Murphy*, 819 F. App'x 77, 79 (3d Cir. 2020) (citing *United States v. Poellnitz*, 372 F.3d 562, 566 (3d Cir. 2004). "What matters is whether [the defendant] committed [a] crime as a matter of fact." *Id.* Thus, "to revoke [supervised release,] it is not necessary that the [defendant] be adjudged guilty of a crime, but only that the court be reasonably satisfied that he has violated one of the conditions" of his release. *Id.* (quoting *Poellnitz*).

3.  It is not necessary for the victim to testify in order to prove the violation. In *Murphy*, the victim recanted, but the court's finding of a violation was affirmed based on a 911 call, photographs of the victim's injuries, and her statements to police shortly after the incident. *Id.* at 80.

4.  Supervised release violations are graded by their level of severity. Grade A violations require conduct constituting a crime punishable by a term of imprisonment exceeding one year and also, as relevant here, conduct that constitutes a "crime of violence." U.S.S.G. § 7B1.1(a)(1). Grade B violations involve conduct constituting any other federal, state, or local offense punishable by more than a year. Grade C Violations involve conduct constituting a crime punishable by a term of imprisonment of one year or less; or a violation of any other condition of supervision.

5.  The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that--
(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c). U.S.S.G. § 4B1.2.

6. As explained in *United States v. Colon*, 802 F. App'x 679 (3d Cir. 2020), "[t]o determine whether a defendant's conduct constitutes a crime of violence in the context of a revocation proceeding, district courts do not examine just the elements of the charged offense or crime of conviction but instead look to 'the defendant's actual conduct[.]'" *Id.* at 682 (quoting *Carter*, 730 F.3d at 192; U.S.S.G. § 7B1.1 cmt. n.1).

7. Although the evidence need not be admissible, a district court "must base its determination on information that ha[s] sufficient indicia of reliability to support its probable accuracy." *Id.* (quoting *United States v. Rowe*, 919 F.3d 752, 762 n.8 (3d Cir. 2019)).

8. The government contends that Sherrell violated his supervised release by committing four crimes under Pennsylvania law, despite the fact the charges were withdrawn: (1) strangulation; (2) simple assault; (3) indecent assault by forcible compulsion; and (4) false imprisonment.

9. Strangulation, indecent assault by forcible compulsion and false imprisonment may qualify as crimes of violence punishable by more than 1 year in prison that would support a Grade A violation. Simple assault is not a crime of violence and would be a Grade B violation. Engaging in prohibited contact with the victim, in violation of the terms of supervised release, is a Grade C violation.

10. The elements of strangulation, in violation of 18 Pa. Cons. Stat. § 2718, are:

a. the defendant impeded the breathing or circulation of the blood of the victim by applying pressure to the throat or neck, or by blocking the nose and mouth of the victim;

b. the defendant's conduct in this regard was knowing or intentional; and

c. the act was committed against a person, the victim, who was a family or household member of the defendant.[3]

Infliction of a physical injury to a victim is not an element of the offense. 18 Pa. Cons. Stat. § 2718(b).  *Commonwealth v. Seif*, 240 A.3d 918 (Pa. Super. Ct. 2020).

11. The elements of indecent assault by forcible compulsion, in violation of 18 Pa. Cons. Stat. § 3126, are:

a. That the defendant had indecent contact with the victim or caused the victim to have indecent contact with him;

b. That the defendant had or caused the contact by forcible compulsion or a threat of forcible compulsion that would have prevented resistance by a person of reasonable resolution of the victim; and,

c. That the defendant acted knowingly, or at least recklessly, regarding the victim's nonconsent.

Pa. Suggested Std. Jury Instr. 15.3126B

12. The elements of false imprisonment in violation of 18 Pa.C.S. § 2903(a) are:

a. That the defendant restrained the victim unlawfully so as to interfere substantially with her liberty; and

---

[3] Sherrell concedes that this element is satisfied because the victim was a former sexual partner.

b. That the defendant did so knowingly. In other words, the defendant was aware that he was restraining the individual and that the restraint was unlawful and interfered substantially with the individual's liberty.

Pa. Suggested Std. Jury Instr. 15.2903.

13. The elements of simple assault resulting in bodily injury in violation of 18 Pa.C.S. § 2701(a)(1) are:

a. That the defendant caused bodily injury to the victim; and,

b. That the defendant's conduct in this regard was intentional, knowing, or reckless.

Pa. Suggested Std. Jury Instr. 15.2701B

14. The court concludes that Sherrell did not commit the crime of strangulation.

15. The court concludes that Sherrell committed the crime of indecent assault (Grade A) because he knowingly and forcibly attempted to engage in sexual intercourse with the victim against her will and without her consent. Sherrell pulled the victim's pants down and she felt his penis on her inner thigh.

16. The court concludes that Sherrell committed the crime of false imprisonment (Grade A) because he knowingly restrained the victim's liberty against her will when he drove her to the Minnotte Square industrial park, instead of taking her to her home. Sherrell also held the victim against her will when he dragged her back to the car after the assault and drove her back to the North Side.

17. The court concludes that Sherrell committed the crime of simple assault (Grade B) because he knowingly caused numerous bodily injuries to the victim, including redness and scrapes on her neck, back, buttocks and knee and cuts to her lip and mouth, as documented by the photographs taken by Robl the night of the incident.

18. Based upon defendant's admission (ECF Nos. 643, 648), the court concludes that Sherrell committed a Grade C violation by having prohibited contact with the victim.

19. Based on the most serious violation, the court concludes that Sherrell committed a Grade A violation of the terms of his supervised release. U.S.S.G. § 7B1.1(b) ("Where there is more than one violation of the conditions of supervision, or the violation includes conduct that constitutes more than one offense, the grade of the violation is determined by the violation having the most serious grade.")

The court will hold a hearing on February 9, 2021 at 1:30 p.m, by videoconference, to consider the appropriate sanction, and provide Sherrell his right to allocution.

In the interim, all conditions of supervised release remain in full force and effect.

SO ORDERED this 21st day of January, 2021.

BY THE COURT:

/s/ Joy Flowers Conti
Joy Flowers Conti
Senior United States District Judge